1  
2  

LISA WEISSMAN-WARD (CA Bar No. 298362)[1]
SHANTI THARAYIL (CA Bar No. 330123))
IMMIGRANTS' RIGHTS CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 724-7396
Facsimile: (650) 723-4426
lweissmanward@law.stanford.edu
tharayil@law.stanford.edu

3  
4  
5  
6  
7  

Attorneys for Plaintiff, Centro Legal de la Raza

8  

# UNITED STATES DISTRICT COURT

9  

## NORTHERN DISTRICT OF CALIFORNIA

10  

### (San Francisco Division)

11  

| | |
|---|---|
| CENTRO LEGAL DE LA RAZA, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. § 552** |
| FEDERAL BUREAU OF PRISONS, | |
| Defendant. | |

12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  

[1] Stanford Law School Immigrants' Rights Clinic law student intern, Michael Rover, participated in the preparation and drafting of the FOIA complaint.

27  
28

**INTRODUCTION**

1.     The Federal Bureau of Prisons ("BOP" or "Defendant"), an agency within the U.S. Department of Justice ("DOJ"), is improperly withholding records pertaining to its role in administering the Institutional Hearing Program ("IHP"). The IHP is an expedited deportation process. When a noncitizen is placed into the IHP, their immigration removal proceedings begin while they are still in criminal custody and while they are still serving their sentence. This differs significantly from the common practice of how removal proceedings operate for other noncitizens who are in custody on account of a conviction. Under this latter practice, the Department of Homeland Security ("DHS") waits until the noncitizen has completed their criminal sentence and only formally initiates removal proceedings once the sentence is over. In practice, the IHP functions as a fast-track deportation mechanism with little regard for noncitizens' abilities to mount defenses to deportation. To facilitate the removal proceedings of noncitizens in federal prisons,[2] BOP partners with United States Immigration and Customs Enforcement ("ICE"), a part of DHS, and the Executive Office for Immigration Review ("EOIR"), the immigration court, which is a sub-agency of DOJ. Beginning in 2017, the Trump Administration announced the expansion of the IHP for the explicit purpose of "speed[ing] the process of deporting incarcerated criminal aliens."[3]

---

[2] This complaint deals only with the IHP as it operates in facilities under BOP's control, i.e. federal prisons. However, the program is much more widespread: Upon information and belief, in addition to operating in federal prisons and in partnership with BOP, the IHP also operates at state and local correctional facilities. *See* 8 U.S.C. § 1228 (requiring that the Attorney General "provide for the availability of special removal proceedings at certain Federal, State, and local correctional facilities").

[3] Press Release, Office of Pub. Affairs, U.S. Dep't of Justice, Attorney General Sessions Announces Expansion and Modernization of Program to Deport Criminal Aliens Housed in Federal Correctional Facilities (Mar. 30, 2017), https://www.justice.gov/opa/pr/attorney-general-sessions-announces-expansion-and-modernization-program-deport-criminal.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER THE FREEDOM OF INFORMATION ACT

2.      Despite the clear public messaging as to why the Trump Administration decided to expand the IHP, details about BOP's administration of the program remain elusive. This is a large program, touching many federal correctional institutions from coast to coast and implicating many other federal agencies, including federal immigration courts across the country and DHS. But its size has not produced a commensurate wealth of information. Instead, advocates have only been able to give the public and their own clients' speculation and guesswork, rather than evidence-based assessments of the changes to the IHP under the Trump Administration. Crucially for advocates representing noncitizens placed in the IHP ("IHP respondents"), BOP is responsible for significant aspects of the effective administration of the IHP, including: agreeing to serve as an IHP facility in the first place; facilitating DHS immigration investigations (which often result in placement into the IHP); ensuring IHP respondents' attendance at their hearings; facilitating critical communication between immigration courts and IHP respondents; and controlling all correspondence between IHP respondents and their attorneys. Records in BOP's custody can answer important questions about the IHP's impact on respondents, who face the daunting prospect of defending against deportation while serving prison sentences.

3.      Plaintiff Centro Legal de la Raza ("Plaintiff" or "Centro Legal") sought records relating to BOP's administration of the IHP in a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, as amended ("the Request"). In response, BOP produced a total of thirty-nine pages, including an incomplete and incomprehensible spreadsheet.[4] BOP partially withheld four of the 39 pages of its production, and of the pages it released in full, one

---

[4] Only the first page of that spreadsheet contains unique information; the other pages are redundant, with rows of empty cells next to portions of the two columns present on the first page.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER THE FREEDOM OF INFORMATION ACT

was completely illegible due to prior redactions. Unable to meet its clients' and its community's needs for information about the IHP with only these documents, Plaintiff filed an administrative appeal ("Appeal"), asking that BOP remedy its failure to produce records responsive to the Request. BOP failed entirely to respond to the Appeal. Over eight months after Plaintiff's Appeal, and over nineteen months after Plaintiff's original Request, BOP has still not fulfilled its obligations under FOIA and, as such, Plaintiff brings this action seeking an order compelling BOP to fulfill those obligations.

## JURISDICTION, VENUE & INTRADISTRICT ASSIGNMENT

4.      This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-06.

5.      Venue is proper in this district under 5. U.S.C. § 552(a)(4)(B) because Centro Legal has its principal places of business in this district. Venue is also proper under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to this action occurred in this district.

6.      Assignment to the San Francisco Division is proper pursuant to Civil Local Rules 3-2(c) and (d), because a substantial part of the events which give rise to the claims occurred in San Francisco County and Alameda County. The San Francisco Immigration Court is the Immigration Court where Plaintiff Centro Legal has represented clients in IHP proceedings and is located in San Francisco County. Plaintiff is headquartered in Alameda County. Cases arising from events taking place in Alameda County may properly be assigned to either the San Francisco Division or the Oakland Division under Civil Local Rule 3-2(d). However, this case

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER THE FREEDOM OF INFORMATION ACT

arises principally from events taking place in San Francisco County, so assignment to the San Francisco Division is more appropriate.

## PARTIES

7.     Plaintiff Centro Legal de la Raza ("Centro Legal") is a non-profit organization that protects and advances the rights of low-income, immigrant, Black, and Latinx communities through bilingual legal representation, education, and advocacy. Centro Legal's immigration practice focuses on serving vulnerable immigrant community members, including detained individuals in removal proceedings. Centro Legal's in-house removal defense practice specializes in cases that are urgent and often involve novel legal issues, while its pro bono immigration program trains, assists, supervises, and mentors pro bono attorneys representing clients before the San Francisco Immigration Court. With the expansion of the IHP, Centro Legal has devoted extensive resources specifically to IHP respondents and their families. This includes providing full scope representation to IHP respondents, providing pro se legal assistance to IHP respondents, engaging in advocacy to ensure access to counsel and, more recently, advocacy around COVID-related prison facility conditions on behalf of IHP respondents.

8.     Defendant, the Federal Bureau of Prisons ("BOP"), is a federal agency within the meaning of 5 U.S.C. § 552(f). It is tasked with managing federal prisons and other correctional institutions, including privately contracted BOP sites ("contract prisons"), and it is responsible for the custody and care of federal prisoners. BOP plays an essential role in administering the IHP because IHP respondents in federal prisons, whether federally or privately run, are necessarily in BOP's custody. Upon information and belief, BOP agrees to host IHP proceedings in certain facilities, where it is responsible for: ensuring respondents' attendance at IHP hearings; relaying information about IHP proceedings to respondents; and maintaining communication

between IHP respondents and their attorneys. Upon information and belief, BOP also provides information regarding prisoners' alleged countries of citizenship to ICE, precipitating placement in the IHP. Upon information and belief, given their pivotal role in the program's operation and administration, BOP has the requested records in their possession, custody, or control.

**FACTS**

**I.   BOP IS AN INTEGRAL PART OF THE IHP, WHICH IS AN EXPANSIVE, NATIONAL PROGRAM DESIGNED TO EXPEDITE IMMIGRATION REMOVAL PROCEEDINGS FOR INCARCERATED NONCITIZENS.**

9.      The IHP is an interagency program that places noncitizens serving sentences in federal prisons in removal proceedings during the terms of their incarceration. IHP respondents must organize their defenses against deportation, locate and hire attorneys (if they are able), exchange correspondence with attorneys about their cases, and attend hearings, all while incarcerated in federal prisons that may not be set up for attorney-client visits, in part because many are post-conviction facilities.

10.      The outcomes of IHP removal proceedings take effect immediately upon the completion of respondents' sentences: If an IHP respondent completes their immigration case while still serving their sentence and the outcome is a deportation order, they will be processed for deportation directly upon release from prison.

11.      If an IHP respondent's removal proceeding has not resulted in a final decision by the end of the prisoner's sentence, ICE takes custody of the prisoner and transfers them to civil immigration detention, where their removal proceeding will continue. By moving up the start of removal proceedings, the IHP serves the purpose—at least in theory—of expediting removal proceedings. Upon information and belief, EOIR and ICE set the agenda for the program, and

BOP plays a critical role by managing logistics related to identifying and placing prisoners in removal proceedings as well as facilitating the logistics of the actual hearings.

12.     The IHP has operated continuously in some form since 1986 and was active, as of January 2018, in at least twenty-one BOP facilities across the country.[5] According to data from BOP, approximately 17% of federal prisoners, over 27,000 individuals, were noncitizens as of June, 2020.[6] Upon information and belief, a large portion of those 27,000 prisoners will, at some point, be placed in IHP removal proceedings. BOP, EOIR, and ICE have processed thousands of IHP respondents in recent years and have placed a significant portion of the current population of noncitizen federal prisoners into the IHP. Between Fiscal Year 2014 ("FY 2014") and Fiscal Year 2018 ("FY 2018"), 13,866 federal prisoners passed through the IHP.[7]

13.     The IHP places many noncitizen prisoners in untenable positions and forces them to defend against deportation with restricted access to attorneys and restricted support from their communities. BOP controls attorney-client communications and communications between IHP respondents and their family members. As gatekeeper of communications, BOP is responsible for all the interactions that may prove crucial to an IHP respondent's defense against deportation. While ICE may be the agency that formally initiates the removal proceedings and while EOIR may be the agency that ultimately determines removability, BOP is intimately involved with identifying who is placed into the IHP and how they—as individuals—experience removal

---

[5] U.S. Dep't of Justice Exec. Office for Immigration Review, Fact Sheet: Institutional Hearing Program 1 (2018).
[6] Fed. Bureau of Prisons, *Inmate Citizenship* (Aug. 1, 2020) https://www.bop.gov/about/statistics/statistics_inmate_citizenship.jsp.
[7] *See* U.S. Dep't of Justice, FY 2018 Statistics Yearbook at 21 (2018), https://www.justice.gov/eoir/file/1198896/download (listing annual IHP "initial case completions" between 2014 and 2018, which were added together to produce the 13,866 figure).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER THE FREEDOM OF INFORMATION ACT

proceedings, including how they are able to access counsel and prepare their defense against the threat of deportation.

14.    Upon information and belief, BOP identifies who in its physical custody is a noncitizen. It then shares that information with ICE. Upon information and belief, BOP permits ICE access to its databases and allows ICE agents to physically enter their prison facilities in order to conduct interviews and investigations of those alleged to be noncitizens.

15.    Upon information and belief, BOP has the ability to and, in fact, does transfer noncitizen prisoners to BOP facilities designated as IHP "hearing sites," where IHP respondents participate in hearings via teleconference. Upon information and belief, BOP must actively consent and agree to designate one of its facilities as an IHP hearing site. At its IHP hearing sites, BOP coordinates with ICE and EOIR to organize the hearings, and BOP is responsible for facilitating the hearings, usually through video teleconference equipment. BOP is also responsible for ensuring that IHP respondents attend those hearings. Without BOP's direct and active involvement, no federal prisoner would be processed through the IHP.

16.    BOP controls essential parts of IHP respondents' efforts to build effective defenses against deportation. As a practical matter, BOP is responsible for the day-to-day infrastructure that allows for just outcomes in removal hearings. If IHP respondents encounter impediments to building defenses within BOP facilities, BOP is responsible. Plaintiff's Request targets information that is critical to ensuring that IHP respondents' due process rights and statutory rights are being respected in BOP facilities and contract prisons. *See* 8 U.S.C. § 1229a(b)(4) (requiring that respondents in removal proceedings "have the privilege of being represented . . . by counsel" and that respondents "have a reasonable opportunity to examine the evidence . . . [and] to present evidence on [their] own behalf").

17.     BOP's responsibilities include: (1) ensuring adequate access to phones and other outside communication (such as mail) for IHP respondents to hire attorneys; (2) providing confidential communications between IHP respondents and their attorneys; (3) allowing free exercise of the statutory right to gather evidence by providing access to legal materials and country condition documents or letters of support for pro se IHP respondents; and (4) keeping IHP respondents informed of date court dates, which come with corresponding deadlines. With the issues of access to communications and attorney-client confidentiality in mind, Plaintiff sought documents relating to the "rights, privileges, and protections afforded to [IHP respondents]," and "records . . . governing the ability of attorneys to meet and talk with clients at IHP hearing sites located in California, and respondents' access to private, unmonitored legal telephone calls." *See* Exhibit A (Copy of FOIA request) at 3-4. Additionally, aware of the importance of respondents' right to gather evidence, Plaintiff further requested documents "describing any federal or state conditions, detention, or imprisonment standards that apply to [IHP respondents]." *See* Exhibit A at 3. Finally, because no respondent can defend against deportation without an accurate immigration court schedule, Plaintiff sought "records . . . concerning the operation of IHP hearing sites," as well as "records describing the obligations of BOP administrators to provide information about the IHP to prisoners." *See* Exhibit A at 2-3.

18.     BOP plays a critical role in the IHP. BOP, as a physical host of the program, is necessary for the IHP to function in federal prisons. BOP, as the physical custodian of federal prisoners, holds exclusive power over IHP respondents and their ability to engage with the outside world and present their defenses against the threat of deportation.

//

//

## II.   ADVOCATES LACK THE INFORMATION NECESSARY TO ADEQUATELY RESPOND TO THE NEEDS OF IHP RESPONDENTS, EVEN AS THE PROGRAM HAS EXPANDED.

19.     In January 2017, during its very first week of office, the Trump Administration issued back-to-back executive orders aimed at increasing immigration enforcement across the federal government. Executive Order 13767, "Border Security and Immigration Enforcement Improvements,"[8] called for expedited removal of noncitizens with criminal convictions. Executive Order 13768, "Enhancing Public Safety in the Interior of the United States,"[9] targeted noncitizens with criminal convictions for prioritized immigration enforcement. These two orders impacted both noncitizens in detention and those outside of detention. The IHP was a natural focal point for the sentiments and political priorities expressed in these orders. The IHP both expedites removal of noncitizens with criminal convictions and effectively precludes the possibility that, should ICE not take them into custody, they might be reunited with their family and community members.

20.     Seeking to capitalize on the IHP's potential to quickly produce removal orders, the Trump Administration directed DHS to increase numbers of noncitizens in federal prisons processed through the IHP "to the maximum extent possible."[10] Plaintiff has seen the effects of this policy firsthand, nowhere more clearly than at Federal Correctional Institution, Dublin ("FCI

---

[8] Exec. Order No. 13767, Border Security and Immigration Enforcement Improvements (Jan. 25, 2017), https://www.whitehouse.gov/presidential-actions/executive-order-border-security-immigration-enforcement-improvements/.
[9] Exec. Order No. 13768, Enhancing Public Safety in the Interior of the United States (Jan. 25, 2017), https://www.whitehouse.gov/presidential-actions/executive-order-border-security-immigration-enforcement-improvements/.
[10] Memorandum from John Kelly, Sec'y, U.S. Dep't of Homeland Sec. on Enforcement of Immigration Laws to Serve the National Interest (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER THE FREEDOM OF INFORMATION ACT

Dublin"), a federal prison for women where many of Plaintiff's clients serve their sentences. Whereas in fiscal years 2015 and 2016, 78 and 79 new deportation proceedings originated from FCI Dublin, by 2018 and 2019, those numbers had doubled to 148 and 128 new removal proceedings, respectively.[11] Given the Trump Administration's public statements, the reason for the spike is clear: Removing noncitizens convicted of federal crimes has become a political priority, regardless of the problems it poses for IHP respondents and their attorneys.

21.     The Trump Administration correctly recognized the IHP is an unforgiving and effective method of hastening deportations, in line with its general policy of "ensur[ing] the removal" of noncitizens that it believes "have no right to be in the United States."[12] IHP respondents often fight losing battles for lawful status while isolated from their families—who often include U.S. citizens—and their communities, especially during the pandemic. One study on the IHP found that detained immigrants, including IHP respondents and those in immigration detention, were nearly five times less likely to be represented by legal counsel.[13] The same researchers determined that fewer than one in ten IHP respondents had legal representation— even fewer than detained respondents in civil detention.[14]

---

[11] New Deportation Proceedings Filed in Immigration Court by Nationality, State, Court, Hearing Location, Year, and Type of Charge, Transactional Records Access Clearinghouse (Aug. 4, 2020 8:52 a.m.), https://trac.syr.edu/phptools/immigration/charges/deport_filing_charge.php (select a fiscal year on the left side, leaving other options at the left untouched, then, select California at the bottom left under the "State" column, then select "Pleasanton – Federal Correctional Institution"—which is how this web site refers to FCI Dublin—and repeat this process for all four years).
[12] Exec. Order No. 13768, Enhancing Public Safety in the Interior of the United States (Jan. 25, 2017), https://www.whitehouse.gov/presidential-actions/executive-order-border-security-immigration-enforcement-improvements/.
[13] Ingrid V. Eagly & Steven Shafer, *Access to Counsel in Immigration Court* 5 (2016) https://www.americanimmigrationcouncil.org/sites/default/files/research/access_to_counsel_in_immigration_court.pdf.
[14] Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 24 (2015).

22.     Three and a half years after the Trump Administration ordered a rush of activity with the goal of removing noncitizens in federal prisons as quickly as possible, the program remains hidden. While journalists continue to probe ICE's treatment of families[15] and other detainees,[16] particularly in the context of the pandemic,[17] and while calls for prison reform abound, the IHP has remained inscrutable to the public. Plaintiff filed the Request to address the lack of information hindering a robust national conversation about the IHP. Despite having represented clients in the IHP for years, Plaintiff still lacks the information to explain strategies for navigating the IHP to its current and future clients, and to help the communities it serves understand the complex interagency cooperation required to run the IHP.

23.     For IHP respondents, their families, and their communities, the national political conversations about immigration, criminal justice reform, and conditions in prisons are both personal and urgent. Whatever EOIR and ICE's policies may be, and whatever limited public statements they may have made about the IHP, the day-to-day experiences of IHP respondents depend squarely on choices made by BOP.

24.     Plaintiff is uniquely positioned to use documents obtained in its Request both to help its clients navigate the IHP and to explain the effects of the IHP to their communities and to the public at large. Plaintiff routinely advocates for systemic change to the immigration system

---

[15] Aguilera, Jasmine, *'Family Separation 2.0.' Parents in ICE Detention Have To Decide Whether to Keep Their Children or Release Them To Sponsors*, Time Magazine (Aug. 4, 2020, 7:49 a.m.), https://time.com/5866659/ice-parents-children-detention-coronavirus-release/.

[16] Alvarez, Priscilla, *Nearly 75% of detainees at US immigration facility in Virginia have coronavirus*, CNN (Aug. 4, 2020, 7:50 a.m.), https://www.cnn.com/2020/07/23/politics/immigration-ice-detention-coronavirus-farmville/index.html.

[17] Currier, Cora, *Letters from ICE Detainees Expose Desperate Prison Conditions Amid Coronavirus Pandemic*, The Intercept (Aug. 4, 2020, 7:52 a.m.), https://theintercept.com/2020/07/27/ice-detention-coronavirus-letters/.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER THE FREEDOM OF INFORMATION ACT

and is well-practiced in promoting the rights of immigrants on a local, regional, and national scale.

26.     Plaintiff tailored its FOIA request to respond directly to the needs of IHP respondents, their families, and their communities. Those interested parties are eager to know how IHP facilities under BOP's control are designated, where BOP may hold them, their clients, or their loved ones during IHP proceedings, at what point in their sentences prisoners might face active immigration removal cases, how attorneys can speak with clients held at BOP facilities, what rights IHP respondents in BOP custody may have, and other essential information in BOP's possession. Plaintiff's interest in these records is identical to any attorney's interest in basic legal research: Without information, it cannot advise its clients. These records are essential to Plaintiff's efforts to ensure its clients' due process rights, and to advocate for the rights of those it does not directly represent.

## III.     PLAINTIFF SUBMITTED A FOIA REQUEST SEEKING THE INFORMATION IT REQUIRES TO RESPOND TO THE NEEDS OF IHP RESPONDENTS.

26.     In order to better serve its current and future clients in IHP proceedings, and because the Trump Administration withheld important information about its expansion of the IHP from the public, Plaintiff submitted a request for records pursuant to FOIA, 5 U.S.C. § 552, dated November 30, 2018, pertaining to BOP's role in administering the IHP and the impacts of BOP's actions on IHP respondents.[18] A true and correct copy of this letter is attached as **Exhibit A**.

---

[18] Plaintiff's Request also included a request to expedite processing that prompted further correspondence unrelated to this complaint. On December 6, 2018, BOP sent a letter to Plaintiff acknowledging Plaintiff's FOIA request and Plaintiff's request to expedite processing. That letter assigned a FOIA request number and denied Plaintiff's request to expedite processing. On March 6, 2019, Plaintiff sent a letter appealing BOP's denial of its request to expedite processing. On March 11, 2019, BOP denied Plaintiff's appeal.

27.     BOP acknowledged receipt of Plaintiff's Request in a letter dated December 6, 2018. A true and correct copy of this letter is attached as **Exhibit B**.

28.     In its Request dated November 30, 2018, Plaintiff sought "[a]ll records describing or including any guidance or training provided to BOP concerning the operation of IHP hearing sites," as well as those "that describe which BOP facilities are generally considered IHP release sites." Exhibit A at 2.

29.     Plaintiff also sought "[a]ny records describing the obligations of BOP administrators to provide information about the IHP to prisoners," or "describing or including policies, procedures, memoranda, or guidance concerning when and how prisoners are notified that they are being placed in [the] IHP, including what information they are provided about the program and whether they are advised of their rights in the program." *Id.* at 3.

30.     Plaintiff further requested "[a]ny records describing what rights, privileges, and protections are afforded to noncitizens placed in [the] IHP" and "[a]ny records describing any federal or state conditions, detention, or imprisonment standards that apply to noncitizens by virtue of their being placed in removal proceedings through the IHP." *Id.*

31.     Plaintiff then requested "[a]ll records showing any current . . . agreement entered into between DHS and BOP that governs the implementation, expansion, or operation of the IHP at any BOP facility," both within California and outside California. *Id.* Plaintiff also sought records concerning agreements between DHS and BOP "that pertain to any budget and reimbursement agreements relating to the operation of IHP hearing sites located within California. *Id.*

32.     Plaintiff additionally requested "[a]ny records concerning the designation of BOP facilities located in California as IHP hearing sites or locations," along with facilities "expected

13

to begin serving" in that capacity. *Id.* Plaintiff also sought information regarding "any audits, inspections, or reviews conducted of [the] IHP at individual BOP facilities located in California." *Id.*

33.     Plaintiff then sought records "concerning whether ICE officials maintain a regular physical presence within IHP hearing site[s] . . . located in California. *Id.* at 4.

34.     Finally, Plaintiff requested records "pertaining to or governing the ability of attorneys to meet and talk with clients at IHP hearing sites located in California, including attorneys' access to confidential visitation spaces within each BOP facility, and respondents' access to private, unmonitored legal telephone calls." *Id.*

35.     Plaintiff based its request on Executive Order 13767 and an implementing memorandum issued by the Trump Administration. It also sought a waiver of fees associated with its request. *Id.* at 5.

## IV.     BOP FAILED TO CONDUCT A REASONABLE SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST, FAILED TO RESPOND TO PLAINTIFF'S APPEAL IN A TIMELY MANNER, AND FAILED TO MAKE RECORDS PROMPTLY AVAILABLE.

36.     On August 27, 2019, nine months after Plaintiffs FOIA request, BOP responded. Unfortunately, the response was limited and wholly insufficient. The response contained a total of 39 pages of records. Of the 39 pages, 25 were a spreadsheet. The majority of the 25-page spreadsheet consisted of empty cells and duplicative Excel sheets. Of the remaining 14 pages (that were not part of the excel spreadsheet), BOP only released ten pages in full, and made partial redactions to four pages. Of the ten pages purportedly released in full, one page is entirely illegible due to what appears to be prior redactions. These documents are unresponsive to the majority of the Request. A copy of BOP's August 27, 2019 response, including records provided, is attached as **Exhibit C**.

37.     BOP has failed to make "reasonable efforts" in conducting a search for responsive records. *See* 5 U.S.C. § 552(a)(3)(C). The few documents that BOP provided are of limited relevance to the IHP cannot be the result of a "search reasonably calculated to uncover all relevant documents" pursuant to a detailed, specific Request. *Zemansky v. EPA*, 767 F.2d 569 (9th Cir. 1985). Upon information and belief, such a search of BOP's records relating to the IHP should have resulted in a large quantity of records directly relevant to the IHP.

38.     On November 18, 2019, Plaintiff timely appealed BOP's failure to produce responsive records and BOP's decision to withhold portions of the 14 pages it produced. A true and correct copy of this letter is attached as **Exhibit D**.[19]

39.     Although Plaintiff received an email confirmation that the Appeal had been received as well as confirmation from the U.S. Postal Service that BOP received its Appeal on November 26, 2019, BOP failed to respond to the Appeal within the twenty-day time limit specified by the FOIA statute, 5 U.S.C. § 552(a)(6)(A)(i), or the ten additional days permitted if there is an "unusual circumstance," 5 U.S.C. § 552(a)(6)(B). A copy of the email confirmation and certified mail receipt evidencing that BOP received the Appeal is attached as **Exhibit E**.

40.     BOP has clearly failed to make a timely determination of Plaintiff's Appeal of its FOIA Request, and to make records promptly available. *See* 5 U.S.C. § 552(a)(6)(A)(i), 5 U.S.C. § 552(a)(6)(B), 5 U.S.C. § 552(a)(3)(A). More than eight months have passed since Defendant received Plaintiff's Appeal, *see* Exhibit E, and more than nineteen months have passed since Defendant acknowledged receipt of its Request, *see* Exhibit B.

---

[19] In an effort to not burden the court with duplicative documentation, Exhibit D includes the appeal letter, but not the referenced attachments as they are separately included as Exhibits A and C, respectively.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER THE FREEDOM OF INFORMATION ACT

### FIRST CAUSE OF ACTION
**(Freedom of Information Act—Failure to Conduct a Reasonable Search for Records Responsive to Plaintiff's Request)**

41.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 40 above, inclusive.

42.     By letter dated November 30, 2018, Plaintiff submitted the Request to Defendant pursuant to the Freedom of Information Act (FOIA).

43.     When responding to a FOIA request, BOP has a statutory obligation to search for "agency records for the purpose of locating those records which are responsive to a request." FOIA, 5 U.S.C. § 552(a)(3)(D). Defendant is also required to "make reasonable efforts to search for the records in electronic form or format." 5 U.S.C. § 552(a)(3)(C). Defendant has not provided Plaintiff with records representing efforts reasonably calculated to uncover all relevant records.

44.     Defendant's failure to undertake a search reasonably calculated to uncover all relevant records sought by Plaintiff's request violates FOIA, 5 U.S.C. § 552(a)(3), and corresponding agency regulations, *see* 28 C.F.R. §§ 513.60-513.68.

45.     Plaintiff has exhausted all required and available administrative remedies with respect to this claim. 5 U.S.C. § 552(a)(6)(C)(i).

46.     Plaintiff has a legal right under FOIA to enforce Defendant's obligation to undertake a search reasonably calculated to uncover all relevant records that are responsive to Plaintiff's FOIA request, and there exists no basis for Defendant's denial of this right. *See* 5 U.S.C. § 552(a)(4)(B).

## SECOND CAUSE OF ACTION
**(Freedom of Information Act—Failure to Comply with Time Limit Provision)**

47.     Plaintiff repeats and re-alleges the factual allegations contained in paragraphs 1 through 40, inclusive.

48.     By letter dated November 30, 2018, Plaintiff submitted its original Request for records related to the IHP pursuant to the Freedom of Information Act (FOIA). Nearly one year later, on November 18, 2019, Plaintiff submitted its Appeal of its FOIA Request to Defendant.

49.     Defendant has a statutory obligation to determine whether they will comply with an administrative appeal of their final determination regarding the FOIA request and to communicate that determination to Plaintiff. Plaintiff received confirmation that Defendant received its Appeal, including both an email confirmation and a certified mail receipt dated November 26, 2019. *See* Exhibit E. Nevertheless, Defendant failed to respond to Plaintiff's Request within the 20 days afforded under the FOIA statute, 5 U.S.C. § 552(a)(6)(A)(i), or the additional 10 days provided for "unusual circumstances," 5 U.S.C. § 552(a)(6)(B); *see* 28 C.F.R. § 513.68.

50.     Defendant's failure to notify Plaintiff of their determination whether to comply with Plaintiff's requests violates 5 U.S.C. §§ 552(a)(6)(A)(i) & (a)(6)(B), and 28 C.F.R. § 513.68.

51.     Plaintiff has exhausted all applicable administrative remedies with respect to Defendant's failure to determine whether they will comply with Plaintiff's request. 5 U.S.C. § 552(a)(6)(C)(i).

52.     Plaintiff has a legal right under FOIA, 5 U.S.C. § 552(a)(6)(A)(i), 5 U.S.C. § 552(a)(6)(B), and 6 C.F.R § 5.5(c), to timely notification from Defendant, and there exists no basis for Defendant's denial of this right.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER THE FREEDOM OF INFORMATION ACT

**THIRD CAUSE OF ACTION**
**(Freedom of Information Act—Failure to Make Records Promptly Available)**

53.     Plaintiff repeats and re-alleges the factual allegations contained in paragraphs 1 through 40 above, inclusive.

54.     Plaintiff submitted the Request to Defendant pursuant to the Freedom of Information Act (FOIA) by letter dated November 30, 2018.

55.     On November 18, 2019 Plaintiff appealed Defendant's failure to produce responsive records.

56.     Defendant has a statutory obligation to make records "reasonably describe[d] by Plaintiff's request "promptly available." 5 U.S.C. § 552(a)(3)(A). Defendant has not produced records responsive to Plaintiff's request, despite receiving Plaintiff's Appeal on November 26, 2019.

57.     As of the filing of this complaint, over eight months have passed since Defendant received Plaintiff's FOIA Appeal, and Defendant has neither responded to the Appeal nor produced responsive records. *See* Exhibit E.

58.     Defendant's failure to make records sought by Plaintiff's request "promptly available" violates FOIA. *See* 5 U.S.C. § 552(a)(3)(A).

59.     Plaintiff has exhausted all required and available administrative remedies with respect to Defendant's failure to make records sought by Plaintiff's request "promptly available." 5 U.S.C. § 552(a)(6)(C)(i).

60.     Plaintiff has a legal right under FOIA to obtain the agency records they seek, and there is no legal basis for Defendant's denial of said right.

//

//

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER THE FREEDOM OF INFORMATION ACT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court award them the following relief:

A.      Declare, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Defendant violated the Freedom of Information Act (FOIA), 5 U.S.C. § 552;

B.      Order Defendant to conduct a reasonable search for all records responsive to Plaintiff's FOIA request;

C.      Order Defendant to determine whether they will comply with Plaintiff's appeal of Defendant's determination regarding Plaintiff's FOIA request and to communicate that determination to Plaintiff;

D.      Order Defendant to promptly disclose the requested records in their entirety and make copies available to Plaintiff;

E.      Order Defendant to prepare an index pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974), for any documents they seek to withhold under a FOIA exemption;

F.      Provide for expeditious proceedings in this action pursuant to 28 U.S.C. § 1657;

G.      Award Plaintiff its reasonable costs and attorneys' fees pursuant to 5 U.S.C. § 552(a)(4)(E); and

H.      Order such other relief as the Court deems just and appropriate.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER THE FREEDOM OF INFORMATION ACT

Respectfully submitted,

DATED: August 19, 2020

IMMIGRANTS' RIGHTS CLINIC
Mills Legal Clinic at Stanford Law School

By: /s/ Lisa Weissman-Ward

LISA WEISSMAN-WARD
SHANTI THARAYIL
STANFORD LAW SCHOOL
IMMIGRANTS' RIGHTS CLINIC

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER THE FREEDOM OF INFORMATION ACT